IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER MARIE WISENER, | ) | CASE NO. 5:19CV2199 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Jennifer Wisener ("Wisener") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

As set forth more fully below, the ALJ's decision does not contain specific reasons for the weight he gave to Wisener's alleged symptoms, such that the undersigned cannot assess how the ALJ evaluated those symptoms.  And, because the ALJ's Step Three analysis relied in large part on Wisener's alleged symptoms, it cannot be determined whether substantial evidence supports the ALJ's Step Three findings.  As a result, the undersigned recommends that the Commissioner's decision be **REVERSED and REMANDED** for further proceedings consistent with this opinion.

## I. Procedural History

In April 2016, Wisener filed an application for SSI, alleging a disability onset date of

August 3, 1991.  Tr. 424.  She alleged disability based on the following: ADHD, anxiety, auditory processing disorder, depression, and seizure disorder.  Tr.  428.  After denials by the state agency initially (Tr. 314) and on reconsideration (Tr. 333), Wisener requested an administrative hearing.  Tr. 358.  A hearing was held before an Administrative Law Judge ("ALJ") on July 20, 2018.  Tr. 49-75.  In his September 6, 2018, decision (Tr. 33-42), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Wisener can perform, i.e., she is not disabled.[1]  Tr. 40-41.  Wisener requested review of the ALJ's decision by the Appeals Council (Tr. 405) and, on July 29, 2019, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Wisener was born in 1991 and was 24 years old on the date she filed her application.  Tr. 407.  She has a high school education and attended special education classes.  Tr. 57, 429.  She previously worked part time in fast food restaurants.  Tr. 64-65.

### B. Relevant Medical Evidence

On March 10, 2016, Wisener, accompanied by her mother, visited the emergency room at Aultman Hospital for suicidal ideation and depression after Wisener believed that she had overheard her case manager at Phoenix Rising Behavioral Health Center, where she receives treatment, state that they were trying to place her in a group home and take away her unborn baby.  Tr. 816.  A history of seizures, depression, anxiety, and bipolar schizophrenia was reported.  Tr. 816.  At some point, Wisener's mother called Phoenix Rising, spoke to Wisener's case manager, and learned that the case manager did not state what Wisener had believed she

---

[1] The ALJ considered Wisener's disability as of the date she filed her application, as SSI benefits are payable beginning the month after the application is filed and are not retroactive.  *See* 20 C.F.R. § 416.335.

heard.  Tr. 1211.  Rather, the case manager had discussed meeting with an attorney to begin the process for Wisener to apply for disability benefits.  Tr. 1211.  Wisener's mother informed the emergency room staff and Wisener of what she had learned and stated that she no longer believed Wisener was in danger of hurting herself.  Tr. 1211.  Upon exam, Wisener was cooperative and had an appropriate mood and effect.  Tr. 817.  Her mother advised that Wisener had not been taking psychotropic medication because she was pregnant, and that she had sporadically been on medication in the past but had been noncompliant.  Tr. 816.  The emergency room contacted Wisener's Ob/Gyn, Dr. Domingo, who prescribed Zoloft rather than Prozac due to fewer side effects during pregnancy.  Tr. 816-817.  Wisener was discharged home to her mother as stable and not likely to be a danger to herself or others.  Tr. 817.

On April 18, 2016, Wisener had an appointment at the NeuroCare Center for her epilepsy and was doing well.  Tr. 1327.

On April 19, 2016, Wisener saw Dr. Manudhane, M.D., at Phoenix Rising for medication management.  Tr. 1346-1349.  Dr. Manudhane advised she continue her Zoloft and would consider adding Ativan (which Wisener had requested) after Wisener stopped breastfeeding.  Tr. 1349.  Wisener gave birth on May 12, 2016.  Tr. 1589.  Shortly thereafter, she was continued on Zoloft and prescribed Ativan and Adderall.  Tr. 1714.

In June 2016, Wisener had a follow up appointment for her seizure disorder and reported having had no seizures since her prior visit and that she last had one in September.  Tr. 1670.  An MRI was ordered.  On July 8, the MRI results showed no abnormal parenchymal signal, but right-sided subependymal grey matter heterotopia1, which was described as the source of her seizures.  Tr. 1669, 1759.

On August 9, 2016, Wisener saw Dr. Manuhdane.  Tr. 1698-1701.  She reported that she

had moved back in with her mother and younger siblings after having been living with an aunt. Tr. 1698.  Her uncle said that she could not move in with her aunt.  Tr. 1699.  She reported more anxiety since moving back with her mother and she had been charged with domestic violence for pulling her younger sister's hair.  Tr. 1698.  Upon exam, she had a euthymic mood, full affect, clear speech, a logical thought process, her thought content and insight were within normal limits, but she had an impaired ability to make reasonable decisions.  Tr. 1699, 1713.

On August 24, 2016, Wisener spoke with her Phoenix Rising case manager on the phone. Tr. 1696.  Her case manager asked why she had moved back in with her mother "but she wouldn't tell the full story."  Wisener stated that, since her doctor appointments were by her mother's house, she should stay with her mother.  Tr. 1696.  The case manager believed that Wisener had not told her the whole story regarding why she left her aunt's house.  She believed that something had happened with her aunt to cause Wisener to move back in with her mother. Tr. 1696.

On September 14, 2016, Phoenix Rising generated a transfer summary for Wisener, listing her diagnoses as mild intellectual disabilities and ADHD.  Tr. 1694.  It listed her compliance as inconsistent.  Tr. 1694.

On December 6, 2016, Wisener saw Dr. Manudhane and reported that the medication change had helped a lot (she had stopped Ativan and started Valium).  Tr. 2081, 2083.  She and her mother had been arguing but it was not a problem anymore.  Tr. 2081.  Upon exam, she was cooperative and she had normal exam findings.  Tr. 2082.

On January 12, 2017, Wisener was discharged from Phoenix Rising.  Tr. 2094.  The note stated that she was noncompliant.  Tr. 2094.

On May 10, 2017, Wisener had a follow up appointment for her epilepsy.  Tr. 2144.  She

reported being out of her diazepam and having seizures at night while sleeping.  Tr. 2144.  She was trying to get pregnant and indicated that she could be pregnant.  Tr. 2144.  Upon exam, her concentration, memory, and fund of knowledge were normal.  Tr. 2146.  Her Keppra dosage was increased.  Tr. 2147.

On July 14, 2017, Wisener saw Dr. Manudhane.  Tr. 2174.  She reported having two jobs at fast food restaurants.  Tr. 2174, 2139.  Upon exam, she was cooperative and she had normal exam findings.  Tr. 2175.  She had good insight and judgment into her behaviors and had made good progress.  Tr. 2178.  Her medications were continued.  Tr. 2178.  At that time, she had broken up with a boyfriend and was living with an uncle.  Tr. 2193.

On November 10, 2017, Wisener returned to Dr. Manudhane for medication management.  Tr. 2168.  She reported having had a miscarriage in October.  Tr. 2168.  She was working at McDonald's 20 hours per week.  Tr. 2168.  Upon exam, she was cooperative and had normal findings, except that her mood was anxious.  Tr. 2169.  She had good insight and judgment and had made good progress.  Tr. 2172.  Dr. Manudhane prescribed Zoloft and Valium.  Tr. 2172.

On March 18, 2018, Wisener was taken to the emergency room by her aunt, who described Wisener as being very impulsive (drinking, going off with strangers, increased thoughts of suicidal ideation).  Tr. 2250, 2200.  She had no place to live and was staying with friends.  Tr. 2200.  Her March 26 discharge note describes that she was admitted for bipolar disorder, with a recent episode of depression, anxiety disorder, and PTSD.  She was impulsive, anxious, depressed, and suicidal.  Tr. 2250.  She had recently had Latitude introduced into her medication regime and had felt an increase in suicidal ideation since then.  Tr. 2189.  She was not compliant with taking her medication, although her toxicology screen was positive for her

5

medications Valium and Adderall.  Tr.  2250.  During her hospital admission she was treated with medication, discouraged from being drug-seeking with respect to Ativan, counseled to stay sober, and encouraged to participate in groups and activities and to take better care of her personal hygiene.  Tr. 2250.  Gradually she started to attend groups and activities, and with the help of medication, she was pleasant and cooperative, her affect was brighter, she was socially appropriate, and she was less anxious, depressed, and suicidal.  She was discharged to the crisis stabilization unit with prescriptions.  Tr. 2250-2251.  She was diagnosed with bipolar disorder with a recent episode of depression without psychotic features, anxiety disorder, and PTSD.  Tr. 2250.

On March 30, 2018, Wisener was being examined by a nurse at the crisis unit when the nurse believed she heard a palpitation or murmur, causing Wisener to become very anxious, and, the nurse suspected, have a panic attack.  Tr. 2213.  Wisener was taken to the emergency room, had a normal EKG, and felt better.  Tr. 2213.  On April 3, at the crisis unit, her concentration was noted to be variable.  Tr. 2185.  On April 10, she stated that she was doing "good."  Tr. 2181. The examiner observed that she was on the phone frequently with her boyfriend, that she broke up with him on April 7, was then on the phone with another man she met on a dating site, and then back with her prior boyfriend.  Tr. 2181.  The examiner opined, "Behavior seems younger developmentally than her chronological age."  Tr. 2181.  She had gone to church twice and had visited with her daughter over the weekend.  Tr. 2181.  Upon exam, she had adequate attention and concentration, fair insight and judgment, and intact memory.  Tr. 2182.  She did not have a discharge date, as she still needed to find stable housing.  Tr. 2183.

On May 21, 2018, following her release from the crisis stabilization unit, Wisener was seen by a licensed professional clinical counselor at Valley Counseling for an initial psychiatric

evaluation.  Tr. 2237-2244.  She reported that her mother was taking care of her daughter.  Tr. 2237.  She was working at McDonald's and found it stressful.  Tr. 2237.  She indicated that, regarding her second hospitalization, "she did not want to go back to her mom's so she lied and said she was suicidal."  Tr. 2238.  She reported a history of noncompliance, self-harm, hospitalizations, and multiple outpatient treatment facilities.  Tr. 2243.  The examiner stated that Wisener "was rather vague with her reported symptoms.  Therefore, it was difficult to gauge what areas of her life are impacted."  Tr. 2243.

The next day she saw Dr. Potesta, M.D., at Valley Counseling.  Tr. 2230-2236.  She had recently run out of her Lexapro.  Tr. 2230.  She was living with her fiancé and working at McDonald's.  Tr. 2231.  She recounted her history of treatment and diagnoses.  Tr. 2230-2231.  Upon exam, she had a mildly anxious mood, a mildly constricted affect, mild anhedonia, fair insight and judgment, and had otherwise normal findings.  Tr. 2232-2233.  She was diagnosed with bipolar disorder, moderate with anxious distress; PTSD; and an unspecified problem related to social environment.  Tr. 2235.  Dr. Potesta prescribed medication and recommended a follow up in three months.  Tr. 2236.

### C. Medical Opinion Evidence

#### 1. Consultative Examiner

On September 27, 2016, Wisener saw Dr. Harvan, Ph.D., for a consultative psychological exam.  Tr. 1748-1754.  She had taken the bus to the appointment, looked up the address on her phone, and was 30 minutes early.  Tr. 1750.  She stated that she had had an IEP in school due to her auditory processing disability and ADHD.  Tr. 1749.  She reported that she had been going to Phoenix Rising for the last two years; she saw a counselor once a week and a psychiatrist once a month.  Tr. 1750.  She takes medications and they are effective.  Tr. 1749.  She and her baby live

with her mom and siblings and she cares for her baby and helps with her younger siblings.  Tr. 1750.  She performs household chores such as doing laundry, unloading the dishwasher, sweeping/mopping, and helping with dinner.  Tr. 1750.  She goes shopping and manages her finances.  Tr. 1750.  She takes the dog outside and sometimes her baby.  Tr. 1750.  She contacts friends on Facebook every day or every other day and attends church every Sunday.  Tr. 1750. She reported taking medications that are effective for her mental health symptoms and she denied having panic attacks.  Tr. 1749, 1751.

Dr. Harvan observed that Wisener was cooperative and she did not exhibit bizarre behavior; her speech was somewhat slowed; her thoughts were goal-oriented; she stated that her thoughts were clear and that she was able to concentrate; she displayed a narrow range of affect during the evaluation; and she was oriented to person, time, place, and situation.  Tr. 1751.  Dr. Harvan opined that, based on his examination, Wisener's long- and short-term memory were poor and she exhibited difficulty focusing and concentrating.  Tr. 1751.  He estimated her intellectual functioning to be in the low average to borderline range.  Tr. 1752.  She was currently not maintaining herself independently or functioning independently and Dr. Harvan stated that her judgment was sufficient to avoid contact with civil authorities.  Tr. 1752, 1753. Dr. Harvan concluded that, regarding the ability to understand, remember, and carry out instructions, Wisener is likely to have some difficulty remembering job instructions both short- and long-term and may have some difficulty understanding job instructions given in a figurative language or that were implied, based on her moderate limitations in memory functioning and her difficulty interpreting proverbs.  Tr. 1753.  Regarding her ability to maintain attention, concentration, persistence and pace, she would likely have difficulty focusing and attending in a job setting, she persisted at tasks, and her pace was delayed.  Tr. 1753-1754.  Regarding her

ability to respond appropriately to others in a work setting, she would be unlikely to have significant difficulty.  Tr. 1754.  Finally, regarding her ability to respond appropriately to work pressures in a work setting, she would likely have some difficulty dealing with work pressures. Tr. 1754.

### 2. State Agency Reviewing Physicians

On October 16, 2016, state agency reviewing psychologist Dr. Swain, Psy.D., reviewed Wisener's record and opined that she had mild limitations in performing activities of daily living, moderate limitations in maintaining social interaction, and moderate limitations in maintaining concentration, persistence, or pace.  Tr. 307.  Dr. Swain explained that the evidence showed that Wisener could clearly communicate with others, care for herself, care for her newborn, socialize with friends, shop, and go to public places.  Tr. 3077.  Wisener's statements regarding her symptoms were partially consistent.  Tr. 307.  She opined Wisener was capable of 1-2 step tasks; simple, routine tasks in a setting without demands for a rapid pace; intermittent and superficial social interaction; and could perform in a static work environment with no fast-paced production demands and that Wisener could receive assistance/guidance as needed to perform tasks.  Tr. 309-311.

On February 20, 2017, state agency reviewing psychologist Dr. Malloy, Ph.D., reviewed Wisener's record and opined that she had mild limitations in her ability to understand, remember, or apply information; moderate limitations in interacting with others; moderate limitations in maintaining concentration, persistence, or pace; and moderate limitations in her ability to adapt or manage herself.  Tr. 324.  She opined that Wisener could complete tasks that do not require intense/prolonged focus or a quick pace; can have intermittent and superficial social interaction; can work in a static work environment where there was no fast-paced production demands and

she could receive assistance/guidance as needed to complete tasks.  Tr. 328-329.

### D.  Testimonial Evidence

#### 1. Wisener's Testimony

Wisener was represented by counsel and testified at the administrative hearing.  Tr. 51. At the time of the hearing, she had briefly lived alone because her fiancé, who she had recently started living with, was jailed ten days ago.  Tr. 55-56.  She stated that she was "in danger of losing the house.  So then I will be homeless."  Tr. 56.  When asked why she would be homeless, Wisener stated, "I don't know how to pay bills."  Tr. 65.  Prior to living in the house she was living in hotels.  Tr. 56.  She has never lived alone; she always lived with someone who agreed that she could live there "as long as I abided by their rules."  Tr. 66.  Prior to meeting her fiancé in April, she lived with a family from her aunt's church.  Tr. 66.  While living there, she would do things like vacuum and "mostly just sit and talk with her.  She had me live there just to be her friend."  Tr. 66.  She never got a driver's license because she has anxiety about driving and she lacks knowledge about the laws.  Tr. 56.  Her grandparents drove her to the hearing.  Tr. 56.

Wisener stated that she is unable to work due to her hearing disability, her learning disability, her nerves, and her bipolar.  Tr. 57.  When asked about her hearing disability, Wisener explained that she has auditory processing disorder, and that, as a result, she sometimes misunderstands people or mishears words.  Tr. 57.  She was diagnosed with this as a child and there is no cure.  Tr. 57.  She has seizures, too, but this condition is controlled with medication. Tr. 57-58.

At the time of the hearing, Wisener was pregnant.  Tr. 58.  Her first child lived with Wisener's mother because Wisener was incapable of taking care of her.  Tr. 58.  Her plan when her baby is born is to give it to her mother.  Tr. 67.  When asked if she was currently treating

with a psychiatrist or mental health counselor for her bipolar or anxiety, Wisener stated that she had in the past, but she stopped when her health insurance ran out.  Tr. 58-59.  And, because she is pregnant, she is no longer taking medication.  Tr. 59.  When she was on medication, she was compliant in taking it and it helped.  Tr. 59.  Otherwise, she did not have one-on-one counseling, group therapy was never recommended, and she did not get homework, such as coloring or breathing exercises, to do to help.  Tr. 59-60.  Wisener stated that she has panic attacks every day.  Tr. 60.  They last 20 minutes and are triggered by uncertainty as to what is going to happen.  Tr. 60.  Deep breathing helps.  Tr. 60.  She also has daily crying episodes.  Tr. 60.  She has depression, which affects her ability to do things during the day due to lack of motivation.  Tr. 62.

On a typical day, Wisener watches Netflix.  Tr. 60.  She has no other hobbies.  Tr. 62. When asked, she recalled what program she watched the day before.  Tr. 61.  She attempts to cook meals but it is difficult and she usually ends up burning things.  Tr. 61.  The day before she made French bread pizza.  Tr. 61.  Her grandparents or her mother help her with grocery shopping.  Tr. 61.  They pick her up and she goes shopping with them.  Tr. 61.  Her grandparents also clean the dishes and vacuum.  Tr. 67.  She doesn't see any other family or any friends on a regular basis.  Tr. 61.  She met her fiancé, a Lyft driver, when he drove her someplace.  Tr. 62. When her fiancé was around he would help clean the house, but now that he is in jail no one cleans the house.  Tr. 63.  Her grandparents come over about twice a week and do her laundry. Tr. 63.  She has difficulty sleeping and gets about four hours of sleep a night.  Tr. 63.  She takes naps during the day.  Tr. 63.

Wisener testified that she started working as a cashier at McDonald's a few days prior to the hearing.  Tr. 64.  She had worked one day and it was not going well.  Tr. 64.  She can't count

11

change, she has a hard time taking orders, and she says "What?" a lot to customers because she can't understand them.  Tr. 64-65.  Her prior work attempts, all at fast food restaurants, had not gone well either.  Tr. 65.  She would get help on the first day of the job but after that she could not do it on her own and would be fired "because I don't know what I'm doing."  Tr. 65.

### 2.  Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing.  Tr. 68.  The ALJ asked the VE to determine whether a hypothetical individual with Wisener's age, education, and vocational background could perform work if that person had the limitations that were subsequently assessed in the ALJ's RFC determination, and the VE answered that such an individual could perform jobs that exist in significant numbers in the national economy, such as laundry worker, sorter, and addresser.  Tr. 70-72.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

12

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his September 6, 2018, decision, the ALJ made the following findings:

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

1.    The claimant has not engaged in substantial gainful activity since April 14, 2016, the application date.  Tr. 35.

2.    The claimant has the following severe impairments: Bipolar disorder; Depressive disorder; Anxiety disorder and panic attack; Personality disorder; Post-traumatic stress disorder (PTSD); Attention deficit hyperactivity disorder (ADHD); Mild intellectual disabilities; and Seizure disorder, epilepsy, and convulsions.  Tr. 35.

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 36.

4.    The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: never climb ladders, ropes or scaffolds; avoid all exposure to hazards such as unprotected heights, moving mechanical parts and the operation of motor vehicles; can perform simple, routine and repetitive tasks, but not at a production rate pace (such as assembly line work) and instructions would need to be explicit and could not be implied or presented in figurative language; can interact on an occasional basis with others, including coworkers and the general public, but should be limited to superficial contact meaning no sales, arbitration, negotiation, conflict resolution or confrontation, no group, tandem or collaborative tasks, and no management, direction or persuasion of others; can respond appropriately to occasional change in a routine work setting, as long as any such changes are easily explained and/or demonstrated in advance of gradual implementation, and would need to be provided with occasional assistance or guidance during periods of change.  Tr. 37.

5.    The claimant has no past relevant work.  Tr. 40.

6.    The claimant was born in 1991 and was 24 years old, which is defined as a younger individual age 18-49, on the date the application was filed.  Tr. 40.

7.    The claimant has at least a high school education and is able to communicate in English.  Tr. 40.

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work.  Tr. 40.

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 40.

10.     The claimant has not been under a disability, as defined in the Social Security Act, since April 14, 2016, the date the application was filed.  Tr. 41.

## V. Plaintiff's Arguments

Wisener argues that the ALJ failed to properly evaluate the evidence and consider the listings at Step Three; erred when he considered Wisener's credibility; and failed to satisfy his burden at Step Five.  Doc. 13.

## VI. Law and Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not provide specific reasons for the weight he gave to Wisener's statements regarding her symptoms

To evaluate the credibility of a claimant's symptoms, an ALJ considers the claimant's complaints along with factors such as the objective medical evidence, treating or nontreating source statements, treatment received, and other evidence.  20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304.  The ALJ's decision "must contain specific reasons for the weight given to

the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id*. at *4.

Here, the ALJ found that Wisener's statements concerning the intensity, persistence, and limiting effects of her symptoms "are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Tr. 38.  However, the ALJ's decision does not contain specific and clearly articulated reasons for the weight he gave to Wisener's symptoms that would permit the undersigned to assess how he evaluated those symptoms.  *See id*.  Although the ALJ recited some of Wisener's statements concerning her symptoms, he did not provide analysis as to the weight he gave those statements.  As many of Wisener's statements regarding her symptoms conflicted, the ALJ was required to explain why he credited some of her statements over others.  Moreover, as described more fully below, because the ALJ's Step Three analysis relied in large part on Wisener's alleged symptoms, it cannot be determined whether substantial evidence supports the ALJ's Step Three findings.

### B. The ALJ's reasoning at Step Three relied in large part on Wisener's symptoms, which  the ALJ did not properly evaluate

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the listings in the Listing of Impairments.  20 C.F.R. § 404.1520(a)(4)(iii).  The claimant bears the burden of proving every element of the listing.  *King v. Sec'y Health & Human Servs*., 742 F.2d 968, 974 (6th Cir. 1986).  Although there is no heightened articulation standard at Step Three, the ALJ must provide reasoning enough "to facilitate effective and meaningful judicial review."  *Brock v. Colvin*, 125 F. Supp. 3d 671, 672 (N.D. Ohio 2015) (quoting *Reynolds v. Comm'r of Soc. Sec*., 424 Fed.App'x 411, 414 (6th Cir. 2011)).

The ALJ considered Listings 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.08 (personality and impulse-control disorders), 12.11 (neurodevelopmental disorders), and 12.15 (trauma- and stressor-related disorders).  Tr. 36.  To satisfy Listings 12.04, 12.06, and 12.15, a claimant must demonstrate the Paragraph "A" and "B" criteria or the Paragraph "A" and "C" criteria.  20 C.F.R. § Pt. 404, Subpt. P, Appx. 1, Pt. A2.  To satisfy Listings 12.08 and 12.11, a claimant must demonstrate the Paragraph "A" and "B" criteria.  *Id.*  To demonstrate the Paragraph B criteria, a claimant must have at least one extreme or two marked limitations in the ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt and manage oneself.  *Id.*  To demonstrate the Paragraph C criteria, a claimant must have a serious, persistent impairment and show that that, despite ongoing treatment, therapy, support, and/or a highly structured setting, the claimant has achieved only marginal adjustment.  *Id.*

In addressing whether Wisener's impairments satisfied a listing, the ALJ considered and discussed the Paragraphs B and C criteria and concluded that Wisener's impairments did not satisfy a listing.  Tr. 36-37.  Regarding the Paragraph B criteria, the ALJ found that she had "moderate" limitations in all four areas of functioning.  Tr. 36-37.  Regarding the Paragraph C criteria, the ALJ found that, although Wisener's impairments were serious and persistent, she failed to show that she achieved only marginal adjustment with ongoing treatment and support. Tr. 37.  However, the ALJ's findings are not adequately explained such that the undersigned is able to determine whether his findings are supported by substantial evidence.

First, in his Step Three analysis, the ALJ referenced, but did not cite, evidence in the record and his reference to the record was generalized.  Therefore, it is not clear what evidence the ALJ was relying on and where in the record that evidence can be found.  And the balance of

his decision does not contain adequate record citations or specifics such that the undersigned can discern what evidence the ALJ relied on in Step Three.  Moreover, the ALJ referenced statements made by Wisener that were often inconsistent, but the ALJ did not explain why he gave certain statements more weight than others.  For example, the ALJ stated that Wisener does not receive non-financial help from family members, yet Wisener testified at the hearing that she did receive non-financial help from family members.  Tr. 37, 61, 63, 67.

Next, the ALJ did not accurately summarize the record.  For instance, when considering the Paragraph B criteria regarding Wisener's ability to ability to understand, remember, or apply information, the ALJ explained,

> The claimant alleged that she has difficulty understanding what is said to her, following instruction, completing tasks, and paying bills.  However, the claimant also stated that she could perform simple maintenance, prepare meals, go to doctor's appointments, take medications, and take public transportation.  In addition, the record shows that the claimant was able to provide information about her health, describe her prior work history, follow instructions from healthcare providers, comply with treatments outside of a doctor's office or hospital, and respond to questions from medical providers.

Tr. 36.  The ALJ did not cite any record evidence for these statements.  He did not say what instructions Wisener was given by healthcare providers that she followed.  He did not discuss instances in which she did *not* comply with treatment (e.g., Tr. 1694, 2094, 2250), nor did he explain how, despite this noncompliance, he still deemed her to be compliant with treatment.  And the undersigned cannot discern precisely what "perform simple maintenance" means.

Regarding Wisener's ability to interact with others, the second Paragraph B criteria, the ALJ found Wisener to have moderate limitations, explaining,

> Here, the claimant alleged that she has difficulty engaging in social activities and getting along with others.  However, according to her statements, the claimant is also able to spend time with friends and family, attend church, and live with others.  Finally, the medical evidence shows that the claimant has a good rapport with providers, was described as pleasant and cooperative, and had good interactions with non-medical staff.

Tr. 36.  The record is replete with evidence of Wisener's frequently moving from place to place due to her apparent inability to get along with family members and/or with whomever she was staying.  See, e.g., Tr. 1698-1699, 2190.  The ALJ did not reconcile this evidence with his conclusion that Wisener is able to spend time with family and live with others.  Nor did he identify the "non-medical staff" with whom Wisener had good interactions.

Regarding Wisener's ability to concentrate, persist, or maintain pace, the third Paragraph B criteria, the ALJ found that Wisener had a moderate limitation, stating,

> The claimant contended that she has limitations in concentrating generally, focusing generally, following instructions, completing tasks, and avoiding distractions.  On the other hand, the claimant said that she is also able to prepare meals, watch TV, handle her own medical care, and attend church.  Additionally, the record fails to show an inability to complete testing that assesses concentration and attention.

Tr. 36.  It is not clear what the ALJ meant when he said "[T]he record fails to show an inability to complete testing. . . ."  He did not say whether he meant that there was an absence of record evidence regarding testing or, alternatively, that there was record evidence regarding testing (that he did not identify) that showed Wisener was able to complete the testing.  Moreover, while Wisener testified at the hearing that she is able to prepare meals, she also stated that she usually burns things.  Tr. 61.  Whether this is because she lacks cooking skills or whether she is too inattentive to be able to cook was not explored.  She stated that she watched television but no one asked whether she could follow the television shows and Wisener did not state that she could.  So, too, with respect to her church attendance: Wisener's ability to attend church does not mean that she concentrated or paid attention during church.  In short, the ALJ did not support his reasoning with citations to evidence in the record, nor did he explain how he assessed the evidence to support his conclusions.

Regarding Wisener's ability to adapt and manage herself, the fourth Paragraph B criteria,

the ALJ stated that she had no problems with temper control (Tr. 37), yet she was charged with domestic violence against her younger sister after pulling her sister's hair when the sister took Wisener's phone.  Tr. 1698.  Moreover, when finding that Wisener did not satisfy the Paragraph C criteria because the evidence showed that she achieved more than marginal adjustment, the ALJ reasoned, "The claimant performs activities of daily living without assistance.  The claimant lives on her own and does not require support from family members outside of financial help."  Tr. 37.  He summarized her testimony and stated that she performs household chores.  Tr. 38.  However, at the hearing Wisener testified that she has never lived alone (except for the 10 days preceding the hearing when her boyfriend was jailed), that she did no chores, and that her grandparents came over twice a week to do chores and take her grocery shopping.  Tr. 61, 63, 66.  Her child lived with Wisener's mother because Wisener stated that she was incapable of caring for her, and she planned to give her mother her second baby once it was born.  Tr. 58, 67.  To be sure, Wisener's statements to the consultative examiner almost two years earlier—she had stated that she lived with her mother, took care of her infant, helped care for her younger siblings, and performed household chores (Tr. 1750)—differed markedly from her testimony, but the ALJ did not state that he credited certain statements over others or explain why he did so.

Finally, elsewhere in his decision, the ALJ commented that, shortly after being hospitalized for her bipolar disorder due to impulsive behavior, Wisener reported an improved mood and often communicated on the phone with her boyfriend while staying at a crisis unit.  Tr. 39.  It is not clear how the ALJ interpreted the fact that Wisener often communicated on the phone with her boyfriend because he did not state what conclusions he drew from that fact.  But it should be noted that the examiner expressed concern about Wisener's frequent telephone communication, observing that Wisener was on the phone frequently with her boyfriend and that,

within a matter of days, Wisener: broke up with her boyfriend, started talking on the phone to a new man she met on a dating site, and then was back with her prior boyfriend and talking on the phone "a lot."  Tr. 2181-2182.  In short, it is not clear that, when taken in context, Wisener's frequently communicating by phone with her boyfriend is as positive an indicator as the ALJ suggests.

In sum, the ALJ's reliance upon the record requires more detail and consideration.  The record is replete with inconsistencies but it is the job of the ALJ, not a reviewing court, to reconcile inconsistencies and/or explain why some statements are credited while others are not.[3] On remand, the ALJ will have an opportunity to reconsider Wisener's statements about her symptoms and reassess whether Wisener's impairments meet or equal a listing at Step Three.  As these items likely will impact the balance of the ALJ's decision on remand, the undersigned does not address Wisener's Step Five challenge.

---

[3] *See* SSR 16-3p, 2017 WL 5180304 at *9 ("…inconsistencies in an individual's statements made at varying times does not necessarily mean they are inaccurate. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time. This may explain why an individual's statements vary when describing the intensity, persistence, or functional effects of symptoms.").

## VIII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **REVERSED and REMANDED** for further proceedings consistent with this opinion.[4]

Dated: May 14, 2020

*/s/ Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[4] This opinion should not be construed as a recommendation that, on remand, Wisener be found disabled.